# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Prime Therapeutics LLC, | File No. 18-cv-02715 (ECT/KMM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Ashley D. Beatty, Maxor National Pharmacy Services, LLC, | |
| Defendants. | |

Jacqueline A. Mrachek, Michael M. Sawers, and Laura A. Reilly, Faegre Baker Daniels LLP, Minneapolis, MN, for plaintiff Prime Therapeutics LLC.

Fridrikh V. Shrayber and Julie A. Patter, Cohen & Grigsby, P.C., Pittsburgh, PA; and John Rock, Rock Hutchinson, PLLP, Minneapolis, MN, for defendant Ashley D. Beatty.

Katie M. Connolly, Joel D. O'Malley, and Jeremy D. Robb, Nilan Johnson Lewis PA, Minneapolis, MN, for defendant Maxor National Pharmacy Services, LLC.

---

Prime Therapeutics LLC ("Prime") seeks a preliminary injunction forbidding a former employee, Ashley D. Beatty ("Beatty"), from performing some (but not all) activities in a new job she began recently with Maxor National Pharmacy Services, LLC ("Maxor"). Prime alleges that, if not limited by an injunction, Beatty will inevitably disclose Prime's confidential business information to Maxor. According to Prime, disclosure of this information would violate Minnesota and federal trade-secret statutes and breach a contract between Prime and Beatty. Prime also alleges that the disclosure of its confidential information would cause it to suffer irreparable harm. The Court will deny

Prime's motion, primarily because the law and facts do not show at this preliminary stage that Prime is likely to prevail on the merits or to suffer irreparable harm.

I

A

Prime and Maxor are pharmacy benefit managers ("PBMs"). Overman Decl. [ECF No. 8] ¶ 1; Wheeler Decl. [ECF No. 31] ¶ 16. A high-level description of the business of PBMs helps in understanding this lawsuit and Prime's preliminary-injunction motion. Fundamentally, PBMs administer prescription-drug plans.[1] Beatty Decl. [ECF No. 33-1] ¶ 8; *see* Overman Decl. ¶ 4; Wheeler ¶ 14. To that end, PBMs facilitate relationships with various participants in the prescription-drug market. *See* Beatty Decl. ¶ 14; Overman Decl. ¶ 5; Wheeler Decl. ¶ 54.

From a bird's-eye view, the prescription-drug market starts with drug manufacturers. *Cf.* Shrayber Decl. [ECF No. 33], Ex. 6 at 3. Drug manufacturers sell their products through wholesalers and pharmacies, and pharmacies deliver prescription drugs to consumers, usually based on the terms of consumers' health insurance. *Cf. id.* at 2. PBMs may be involved at each step in this process. For example, PBMs may negotiate

---

[1]     Admittedly, saying that "PBMs administer prescription-drug plans" is like saying automobile dealers "sell cars." There's more to it than that. Take auto dealers. Some auto dealers sell new and used cars; others sell only used cars. Some sell only one brand of car; others sell multiple brands. Some offer maintenance services; others do not. The list could go on. Just so with PBMs. Some PBMs engage in business activities that other PBMs do not, and while classifying an organization as a "PBM" says a lot about the market in which the business operates and the general nature of its activities, it says a lot less about the specific business activities the organization pursues. Suffice it to say PBMs are not all alike.

with drug manufacturers for rebates and inclusion on a formulary (a list of drugs approved for coverage). *See* Beatty Decl. ¶ 9. PBMs may negotiate with pharmacies for discounts in exchange for including the pharmacies in a health plan's network. *See* Overman Decl. ¶¶ 2, 4. PBMs may work with health-benefit providers (including insurers, self-insured entities, and federal Medicare and Medicaid programs) to design benefit plans. *See* Beatty Decl. ¶ 8; Overman Decl. ¶ 7. PBMs may also facilitate the dispensing of drugs to consumers by verifying coverage, calculating copays and coinsurance, and otherwise processing and paying prescription-drug claims. *See* Beatty Decl. ¶ 9; Overman Decl. ¶ 4. Some PBMs own and operate pharmacies. *See* Wheeler Decl. ¶ 23. Others conduct pharmacoeconomic research and clinical trials. *See* Overman Decl. ¶ 4; Shrayber Decl., Ex. 5 at 15–16. Still others provide consulting services related to the prescription-drug market. *See* Wheeler Decl. ¶ 24.

Prime and Maxor dispute to some degree what specific PBM services each of them provides and the extent to which the two compete. Prime says there is meaningful overlap between its business activities and Maxor's. *See* Second Overman Decl. [ECF No. 38] ¶¶ 7–8. Prime advances this position in an effort to establish that Beatty is working for a competitor and is more likely to rely upon Prime's confidential information in her new position with Maxor. To show the opposite, Maxor says that it and Prime are not really competitors and that Beatty will have no use for Prime's confidential information in her new job. *See* Wheeler Decl. ¶ 55. More on this dispute later. For the time being, it seems fair to observe that Prime and Maxor are PBMs, that each engages in some of the activities

described in the previous paragraph, that both engage in at least some similar activities, and that each engages in some activities the other does not.

B

Beatty is a twenty-year PBM-industry veteran who began working for Prime in 2016. *See* Beatty Decl. ¶ 3; Shrayber Decl., Ex. 3. Beatty's employment with Prime was contingent upon her signing a contract entitled "Agreement Regarding Non-Disclosure of Confidential Information, Assignment of Inventions, Non-Competition and Non-Solicitation" ("Agreement") [ECF No. 1-1, Ex. B]. Friese Decl. [ECF No. 9] ¶ 6 & Ex. A. Beatty signed the Agreement on April 5, 2016. Agreement at 8.

Principally at issue in this motion are the Agreement's non-disclosure and non-competition terms. The Agreement's non-disclosure term requires Beatty to "hold all Confidential Information in the strictest confidence *both during and after*" her employment with Prime. *Id.* § 1.B (emphasis added). Elsewhere, the Agreement defines "Confidential Information" as information "whether oral, written, or in electronic form or committed to Employee's memory, which is not generally known by persons not employed by, or parties to contracts with, [Prime]." *Id.* § 1.A. The Agreement's non-compete—quoted here in its entirety in light of its significance to this motion—reads as follows:

> <u>Non-Competition</u>. During Employee's employment and for a period of twelve (12) months following Employee's termination of employment with Company ("Restricted Period"), whether such termination is at the initiative of Employee or Company and regardless of the reason for termination, Employee shall not, directly or indirectly, individually or collectively (including as an officer, director, employee, advisor, agent, consultant or otherwise), render the same or substantially the same services to an entity or operation engaged in the same or similar Business as Company anywhere in the United States. Subject to the foregoing, it is agreed that Employee is free

4

to work for or provide services to a competitor of Company, provided that: (a) such work or services does not include, directly or indirectly, any responsibilities for, or have any connection with, a Competitive Product (defined below) during the Restricted Period or (b) Employee has not assumed a position with a competitor that would lead to the inevitable disclosure of Confidential Information. "Competitive Product" means any product or service that was marketed, sold or under development by Company during the twelve months preceding Employee's termination of employment and: (a) (i) is of the same general type and (ii) is used for the same or similar purposes as a Company product or service; or (b) competes for the same clients, providers or suppliers that Company markets or sells to or purchases from, or is developing to market or sell to or purchase from.

*Id.* § 3.A. The Agreement also contains choice-of-law and choice-of-forum provisions, which state that Minnesota law shall govern "[t]he validity, enforceability, construction and interpretation of this Agreement" and that Beatty consents to jurisdiction in the United States District Court for the District of Minnesota. *Id.* § 5.C.

Beatty held two jobs during her employment with Prime. Beatty's first job was as Vice President of Networks in the Pharmacy and Network Services Department. Friese Decl. ¶ 6; Beatty Decl. ¶ 6. The parties do not describe Beatty's duties in this position. In June 2017, Prime promoted Beatty to the position of Chief Innovation and Network Services Officer. Prime characterizes Beatty's role in this position as "a senior leader . . . tasked with . . . setting the strategic direction of [her] teams . . . and collaborating with other senior leaders." Second Overman Decl. ¶ 12. In a document called a "job matrix," Prime describes the purpose of the Chief Innovation and Network Services Officer position to include several high-level responsibilities, including "establish[ing] the vision and strategy for" a series of departments and organizations within Prime, "execut[ing] on all activities pertaining to the development and maintenance of network management and

PBM innovation strategies," and "ensur[ing] Prime has quality, competitive and accessible pharmacy providers under contract to deliver pharmaceutical services to clients and members at the lowest possible cost of care; as well as product analytics to support innovation products, and services to support new business and current clients." Overman Decl. ¶¶ 13–14 & Ex. A; *see also* Beatty Decl. ¶ 6.

Beatty does not seem to dispute Prime's general description of the position, but she goes into greater detail describing her duties. *See* Beatty Decl. ¶¶ 13–22. In addition to identifying the Prime organizations for which she had responsibility, Beatty describes the activities she undertook with respect to each organization and the approximate amount of time she spent in each area. *See id.* With respect to Prime's Pharmacy Network Management organization, Beatty testifies that her team "manag[ed] the reimbursements" to pharmacies and was "responsible for managing the company's ongoing relationships with its large network of pharmacies." *Id.* ¶ 14. According to Beatty, this occupied approximately sixty percent of her time. *Id.* ¶ 16. Beatty also oversaw Prime's Pharmacy Fraud, Waste, and Abuse area, which "conduct[ed] pharmacy audits and investigat[ed] fraud . . . within Prime's pharmacy network," and the Business Capabilities and Innovation area, which "creat[ed] new service options for existing plans" based on feedback from Prime's Blue Cross and Blue Shield ("BCBS") clients. *Id.* ¶¶ 17, 19. Beatty testifies that she spent roughly fifteen percent of her time in each of these two areas. *Id.* ¶¶ 18–19. Finally, Beatty oversaw the Applied Analytics organization. *Id.* ¶ 20. This group "measur[ed] and report[ed] to Prime's BCBS clients the returns and effectiveness of the

various plans." *Id.* Beatty testifies that she spent something close to ten percent of her time overseeing this group. *Id.*

Prime and Beatty say different things regarding Beatty's involvement in negotiations with pharmacies on behalf of Prime. Prime says that Beatty was "the primary negotiator with pharmacies." Overman Decl. ¶ 15. Beatty seems to concede that she had some involvement in pharmacy negotiations, testifying that she "typically was not involved in negotiations" (saying one is "typically" or "usually" not involved in an activity seems to confess at least occasional involvement), but Beatty also says that she "was not required to develop or negotiate specific rates with pharmacies," and that she never managed relationships with or negotiated with pharmaceutical manufacturers or BCBS clients or members. Beatty Decl. ¶¶ 58–69.

Prime also asserts that Beatty's job exposed her to both high-level strategic and relatively specific confidential information. *See* Overman Decl. ¶¶ 15–18, 20–23. Here, Prime highlights Beatty's role on Prime's "Pricing Committee," which met monthly, and the "Best and Finalist" leadership group, which reviewed bids just before they went to market. Second Overman Decl. ¶¶ 15–16. Prime claims that in these capacities, Beatty was involved in "key discussions and decisions relating to Prime's pricing and services." *Id.* ¶ 15. Beatty acknowledges having had access to some of this information but testifies that she does not currently recall these "figures or formulas" and "never knew [them] by memory." Beatty Decl. ¶ 57.

Prime also points to Beatty's role on a strategic-planning committee. In the final weeks of Beatty's employment at Prime, but before she announced her resignation, she was

appointed to a steering committee "comprised of high-level Prime employees" tasked with creating, developing, and implementing a five-year strategic plan. Overman Decl. ¶ 16; *see also* Second Overman Decl. ¶ 18. In this capacity, Beatty received three PowerPoint presentations, all labeled "Confidential and Proprietary." Overman Decl. ¶ 20. In support of its motion, Prime filed a redacted version of one of these presentations, entitled "Rebate Aggregation Business Review," that identifies a Maxor subsidiary called Gateway Health Partners ("Gateway") by name when discussing the "competitive landscape." Second Overman Decl., Ex. 1 at 5. Prime says all three PowerPoints contained confidential information, ranging from "ways Prime can be more competitive" to "a strategic plan to improve Prime's market share" in underwriting and rebate aggregation. Overman Decl. ¶¶ 21–23. Beatty admits to receiving the presentations, though she testifies that she received them by e-mail while on vacation, that she reviewed them only on her mobile phone, and that she "had no input or involvement in preparing" the PowerPoints and "was not personally involved in any discussions relating to those documents." Beatty Decl. ¶¶ 70–73.

## C

For something close to fourteen of the roughly fifteen months that Beatty worked in the Chief Innovation and Network Services Officer position, Beatty reported directly to Prime's Chief Financial Officer, Alec Mahmood ("Mahmood"). Beatty Decl. ¶¶ 23, 27; Mahmood Decl. [ECF No. 33–2] ¶¶ 3, 7; Second Overman Decl. ¶ 2. Mahmood announced his plans to leave Prime in spring 2018, and his supervision of Beatty ended in August 2018. Beatty Decl. ¶¶ 24–27; Mahmood Decl. ¶¶ 4, 7. In light of Mahmood's departure,

Beatty began reporting to Prime's Chief Operating Officer, David Overman ("Overman"), effective August 2018.  Beatty Decl. ¶ 27; Overman Decl. ¶ 2.

Mahmood's announcement of his resignation prompted Beatty to consider leaving Prime.  Beatty Decl. ¶¶ 24–26.  She interviewed with Maxor in July 2018.  Wheeler Decl. ¶ 6.  During initial meetings with Maxor, Beatty gave Maxor a copy of her Agreement with Prime.  Beatty Decl. ¶ 45.  On August 20, 2018, Maxor sent Beatty an offer of employment.  Shrayber Decl., Ex. 10; Wheeler Decl. ¶ 57 & Ex. A (stating that "Maxor has no interest in receiving any confidential information or Trade Secrets of Prime").  The very next day, Beatty informed Prime that she intended to terminate her employment.  Beatty Decl. ¶ 30; Overman Decl. ¶ 24.  She asked Overman whether she should "throttle back" her involvement at Prime, particularly since she was scheduled to attend meetings with BCBS executives and pharmaceutical providers.  Beatty Decl. ¶ 31.  Saying that it "trust[ed] her integrity," Prime not only said that throttling back her employment would be unnecessary, Beatty Decl. ¶ 31, it asked Beatty to stay on for thirty days rather than two weeks, Overman Decl. ¶ 25.  Beatty declined, and her employment with Prime terminated effective September 6.  Beatty Decl. ¶ 36; Overman Decl. ¶¶ 24–25.  She began working for Maxor on September 20.  Beatty Decl. ¶¶ 40–41; Wheeler Decl. ¶ 44.

Maxor hired Beatty to be Executive Vice President, Industry Relations.  Wheeler Decl. ¶ 31.  As Maxor explains, it envisioned that Beatty's responsibilities in this position would include overseeing five functions—underwriting, rebate reporting, margin analytics, retail-network administration, and auditing—across four businesses: Maxor's rebate-aggregation business, Gateway; Maxor-owned on-site pharmacies;

hospital-pharmacy (or "340B") consulting and services; and its PBM business, MaxorPlus. Wheeler Decl. ¶¶ 31–32.

In an effort to account for Beatty's Agreement with Prime, however, Maxor did not assign all of these responsibilities to Beatty immediately. Instead, Maxor developed a plan to phase in Beatty's responsibilities in four stages. Wheeler Decl. ¶ 30. According to Maxor and Beatty, the four planned phases are:

(1) September 20, 2018, to November 25, 2018: "Listen and learn" Maxor's business from the retiring Chief Financial Officer of Gateway, Maxor's third-party rebate-aggregation business.

(2) November 26, 2018, to January 6, 2019: Supervise rebate-aggregation business, including internal departments handling rebate accounts and client guarantees. Begin supporting financial underwriting for Maxor-owned pharmacies.

(3) January 7, 2019, to March 19, 2019: Work on margin analytics and client reporting, "provid[ing] insights to business leaders to improve business operations."

(4) March 20, 2019, to September 6, 2019: Manage the team responsible for underwriting for MaxorPlus, the PBM business, and manage Maxor staff who handle the retail-pharmacy networks. Begin to negotiate rates with retail-pharmacy networks.

Wheeler Decl. ¶¶ 43–54; Beatty Decl. ¶¶ 46–51.

II

Prime commenced this action against Beatty and Maxor with the filing of its complaint on September 20, 2018. *See* Compl. [ECF No. 1] at 23. Prime asserts claims for breach of contract, misappropriation of trade secrets under a state and a federal statute, tortious interference with contract, and tortious interference with prospective contractual and economic relations. *See id.* ¶¶ 41–84. Prime seeks injunctive and declaratory relief,

as well as monetary damages.  Compl. ¶¶ 85–97; *id.* at 23.  The Court has subject matter jurisdiction because Prime asserts a claim arising under federal law, namely the Defend Trade Secrets Act, 18 U.S.C. § 1836(b).  28 U.S.C. § 1331.  The Court has supplemental jurisdiction over Prime's state-law claims because those claims arise from essentially identical operative facts and, therefore, are "part of the same case or controversy" as the federal claim.  28 U.S.C. § 1367.

Very soon after filing suit, Prime moved for a temporary restraining order and preliminary injunction, requesting expedited handling.  ECF No. 4.  Prime submitted a proposed order, seeking the following relief:

> (1)  An order preliminarily enjoining Maxor from employing Beatty, and Beatty from working for Maxor or any of its parents, subsidiaries or affiliates, in a position involving, directly or indirectly, any services relating to rebate aggregation, analytics, PBM management, or retail-network operations for Maxor, Maxor Plus, or Gateway Health Partners for a period of twelve months from the date of the order;

> (2)  An order preliminarily enjoining Beatty and Maxor from using or disclosing any information relating to, owned by, or created by Prime including, but not limited to, any information related to Prime's five-year strategic plan, discount and rebate data, benefit plan design, analytics, customer contract terms and preferences, pricing methodologies, and margins; and

> (3)  An order requiring Beatty to deliver to Prime all materials in her possession embodying any information relating to, owned by, or created by Prime or that Beatty received during her employment at Prime.

ECF No. 10.  The Court held oral argument on October 23, 2018.[2]  ECF No. 40.

---

[2]  On October 29, Beatty filed a motion to dismiss and supporting papers.  ECF Nos. 41–45.  The Court has not reviewed those papers.

III

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Our Eighth Circuit's oft-cited *Dataphase* decision describes the list of considerations that the Court applies to decide whether to grant preliminary injunctive relief: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999). The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018).

A

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citations omitted) (internal quotation marks omitted). Although this factor uses the term "probability," the movant need not show a greater than fifty percent likelihood of success. *Dwyer*, 294 F. Supp. 3d at 807. And the movant "need only show likelihood of success on the merits on a single cause of action, not every action it asserts." *Id.* "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief

should be denied." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009). Here, at least at this preliminary stage, the Court determines that Prime is not likely to prevail on the merits.

1

The Court begins with Prime's misappropriation claims under the federal Defend Trade Secrets Act ("DTSA") and Minnesota Uniform Trade Secrets Act ("MUTSA"). Like the parties, the Court finds it appropriate to analyze these claims together because the statutes share functionally equivalent definitions of "trade secret," and because courts that have addressed the issue require the same showing of "inevitable disclosure" of trade secrets under both statutes. *See Dwyer*, 294 F. Supp. 3d at 807–08.

The DTSA and MUTSA define a "trade secret" as "information" that "(1) is not generally known or readily ascertainable, (2) has value as a result of its secrecy, and (3) is the subject of reasonable efforts under the circumstances to protect its secrecy." *Id.* at 807 (citation omitted) (internal quotation marks omitted); *see* 18 U.S.C. § 1839(3); Minn. Stat. § 325C.01, subd. 5. To succeed on its trade-secret misappropriation claims, Prime must "define its alleged trade secrets with sufficient specificity." *Hutchinson Tech. Corp. v. Magnecomp Corp.*, No. 06-cv-1703 (JNE/SRN), 2006 WL 2061707, at *5 (D. Minn. July 17, 2006) (citing *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 898 (Minn. 1983)).

Here, Prime claims that it possesses a variety of trade secrets: "method and operational strategy regarding rebates and discounts; processes by which Prime analyzes the healthcare and pharmaceutical markets; employee training manuals, seminars, and

scripts regarding contract negotiation strategies and tactics; pricing, margins, and purchase history of pharmaceutical drugs; administrative fee and fee credit methodologies; relationship development with plan sponsors, pharmacies and pharmaceutical manufacturers; and terms and conditions of Prime's offered services to plan sponsors and their members." Overman Decl. ¶ 8. Prime further alleges that this information is not generally known or readily ascertainable, that there is value to its secrecy, and that it has undertaken reasonable efforts to protect its secrecy. Overman Decl. ¶¶ 8–9 (detailing the measures that Prime has taken to protect its information, including confidentiality agreements, password-protected documents, and annual affirmance of ongoing confidentiality obligations). The evidence Prime offers to show that it possesses trade-secret information seems unsurprising and credible. Prime is a relatively large and sophisticated organization operating in a competitive market, and it seems plain that Prime would create and possess trade secrets.

Defendants do not appear to dispute the premise that Prime possesses some trade secrets. Instead, they criticize Prime for not being sufficiently specific in describing the trade secrets it claims are threatened by Beatty's move to Maxor. For support, defendants cite several cases establishing that "cursory descriptions," *Menzies Aviation (USA), Inc. v. Wilcox*, 978 F. Supp. 2d 983, 995 (D. Minn. 2013), do not meet the burden of showing that trade secrets are at stake. *See, e.g.*, *WEG Elec. Corp v. Pethers*, No. 16-cv-471 (DSD/LIB), 2016 WL 1441793, at *2 (D. Minn. Apr. 12, 2016); *CHS Inc. v. PetroNet, LLC*, No. 10-cv-94 (RHK/FLN), 2011 WL 1885465, at *8 (D. Minn. May 18, 2011); *Hypred S.A. v. Pochard*, No. 04-cv-2773 (JNE/JGL), 2004 WL 1386149, at *5 (D. Minn. June 18,

2004); *New Leaf Designs, LLC v. BestBins Corp.*, 168 F. Supp. 2d 1039, 1043–44 (D. Minn. 2001); *Int'l Bus. Machs. Corp. v. Seagate Tech., Inc.*, 941 F. Supp. 98, 100 (D. Minn. 1992). Defendants' position seems to be that Prime's lack of specificity means Prime has failed to show a likelihood of success with respect to a threshold element of its DTSA and MUTSA claims.

The Court finds that Prime has done enough to show at this early stage that it possesses trade secrets implicated by Beatty's departure. Some of Prime's evidence is specific. For example, Prime describes three PowerPoint presentations and includes in its motion papers a redacted version of one of the presentations. These presentations describe particular elements of Prime's strategic plans, and Prime labeled the documents "Confidential and Proprietary." Overman Decl. ¶ 16; Second Overman Decl. ¶ 18 & Ex. 1 at 5. Prime's less-specific descriptions of some claimed trade secrets—*e.g.*, "pricing, margins, and purchase history of pharmaceutical drugs"—do not altogether undermine its position. It makes sense that Prime would opt not to be more specific in describing data in these areas because that would disclose a level of information it wishes to protect. Prime's position also finds at least some support in legislative records submitted by Beatty. These records document a committee hearing in the Nebraska legislature concerning a bill that would increase transparency from PBMs. *See* Shrayber Decl., Ex. 6 at 1–49. There, a pharmacist from Prime testified essentially that no two PBM contracts are exactly alike. *Id.* at 34 ("[I]f you have seen one PBM contract[,] you've seen one PBM contract . . . . None of those contracts look the same."). The pharmacist went on to explain that although Prime's contracts permit pharmacies to share the costs of therapy options with patients,

those same contracts often also contain confidentiality clauses prohibiting pharmacies, manufacturers, and health plans from disclosing other contract terms. *See id.* at 36–37. In other words, the specifics of rebates, formularies, and other contract terms are often confidential.[3]

But the existence of trade secrets alone is not enough to justify issuance of a preliminary injunction. *Int'l Bus. Machs. Corp.*, 941 F. Supp. at 101. Prime must also show a likelihood of succeeding on its claim that Beatty's employment with Maxor will result in the misappropriation of Prime's trade secrets. With respect to this element, Prime does not allege that Beatty has actually misappropriated any of its trade secrets at this point in time. Prime does not allege, for example, that Beatty possesses paper or electronic copies of contracts, price lists, strategic plans, employee training manuals, seminar materials, contract-negotiation scripts, or purchase histories of pharmaceutical drugs (the documents that Prime says contain its trade secrets). Instead, Prime asserts that Beatty's

---

[3]     Opinions from other district courts bolster Prime's position and this Court's conclusion. For example, in *Saban v. Caremark Rx, L.L.C.*, the court discussed how in the "competitive" PBM industry, "the terms of negotiated rebate agreements . . . and reimbursement rates . . . are generally considered confidential information." 780 F. Supp. 2d 700, 717 (N.D. Ill. 2011). And in *Pharmaceutical Care Management Ass'n v. Rowe*, the court concluded that "PBMs consider [rebates and contractual terms] highly-confidential and strive to maintain [their] secrecy." 307 F. Supp. 2d 164, 178 (D. Me. 2004) (concluding plaintiff sustained its burden of demonstrating that trade secrets existed and granting preliminary injunction). (To be fair, the First Circuit came to the opposite conclusion when reviewing a different issue. *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 308 (1st Cir. 2005). But its determination that this information did not qualify as a trade secret was contingent on the particular facts of that case—specifically, "[t]he record [was] replete with evidence" that the PBMs "ha[d] taken no special steps to protect their information," such as keeping client contracts "in unlocked cabinets in public areas such as hallways." *Id.*)

employment with Maxor threatens "a high degree of probability of inevitable disclosure" and, thus, future misappropriation of Prime's trade secrets. *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 695 (D. Minn. 1986), *aff'd*, 828 F.2d 452 (8th Cir. 1987). Courts refer to Prime's future-misappropriation theory as the "inevitable-disclosure doctrine," and these same courts repeatedly emphasize that it poses a high bar. *See, e.g.*, *AVI Sys., Inc. v. McKitrick*, No. 16-cv-2078 (JNE/HB), 2016 WL 4146087, at *3 n.9 (D. Minn. Aug. 4, 2016) (referencing the "high standard for 'inevitable disclosure' of trade secrets"); *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 869 (D. Minn. 2015) (describing how inevitable disclosure "is a heavy burden" and the movant "stands little, if any, chance of establishing such disclosure").

Maxor urges the Court to reject the inevitable-disclosure doctrine *per se* because it is "a legal theory unrecognized by Minnesota courts." ECF No. 30 at 17. This contention goes too far. It is true that "Minnesota courts have not explicitly adopted or rejected the [inevitable-disclosure] doctrine." *Katch*, 143 F. Supp. 3d at 869 n.13; *see also Int'l Bus. Machs. Corp.*, 941 F. Supp. at 101 n.1 ("The Eighth Circuit has neither accepted nor rejected the 'inevitable disclosure' doctrine."). The doctrine appears to have originated in 1986 in *Surgidev Corp.*, 648 F. Supp. at 695, absent any citation; was affirmed without comment by the Eighth Circuit, 828 F.2d 452; and has since been cited and applied by both state and federal courts (over a dozen times in the District of Minnesota), *see, e.g.*, *Katch*, 143 F. Supp. 3d at 869–73 (collecting cases). The doctrine reflects the common-sense notion that trade secrets merit protection regardless of whether misappropriation has already occurred or inevitably will occur. Regardless, this question need not be resolved

here because even assuming that the doctrine is settled law, the Court finds ultimately that Prime has not met the heavy burden of showing inevitable disclosure.

Here, several factors bear on whether the threatened trade-secret misappropriation Prime alleges is inevitable. These include the degree of competition between Prime and Maxor; the extent to which Beatty's new position is similar to the position she held with Prime; and the actions that Maxor has taken to prevent Beatty from using or disclosing Prime's trade secrets. *See Int'l Bus. Machs. Corp. v. Seagate Tech., Inc.*, No. 3:91-cv-630, 1991 WL 757821 (RGR/JEC), at *3 (D. Minn. Dec. 31, 1991); *accord Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700, 734–35 (N.D. Ill. 2011). Also relevant is whether Prime has shown proof of any wrongdoing, and whether Beatty's actions "justifiably arouse suspicion about [her] intentions" or reveal "nefarious motives." *Honeywell Int'l Inc. v. Stacey*, No. 13-cv-3056 (PJS/JJK), 2013 WL 9851104, at *6 & n.3 (D. Minn. Dec. 11, 2013).

Prime and Maxor compete, but not like Coke and Pepsi. Prime has 27 million covered lives, *see* Shrayber Decl., Ex. 5 at 2, 22, 29; Maxor has fewer than 500,000, Wheeler Decl. ¶¶ 19–20. Pharmacy-benefit administration is a significant portion of Prime's business, *see* Overman Decl. ¶¶ 2, 7, Second Overman Decl. ¶ 4; Maxor does comparatively little, saying that "[m]ost of [its] revenue is generated from businesses other than [pharmacy benefit administration]," Wheeler Decl. ¶¶ 16–17. Prime does not own pharmacies; Maxor does. *See* Wheeler Decl. ¶¶ 17, 23. Prime says it "offers different consulting models to clients regarding the 340B program," but says nothing to suggest that this is an integral part of its business, Second Overman Decl. ¶ 20; Maxor, on the other

hand, says providing 340B consulting services is a significant part of its business, *see* Wheeler Decl. ¶¶ 17, 24–25. Prime says it is planning to grow its third-party rebate-aggregation business, *see* Overman Decl. ¶¶ 16–17, Second Overman Decl. ¶ 18; Maxor says that its wholly owned subsidiary, Gateway, is "the largest independent rebate aggregator in the pharmaceutical business," Wheeler Decl. ¶¶ 26–27.

Prime and Maxor are aware of going head-to-head for PBM contracts on, at most, five occasions in the last eighteen months. *See* Overman Decl. ¶ 27; Wheeler Decl. ¶ 21. Prime persuasively points out that confidentiality ordinarily associated with PBM-contract bids would prevent Prime and Maxor from knowing just how often they competed. *See* Overman Decl. ¶ 10 ("This does not mean that Prime and Maxor have only competed against each other five times."). Regardless, the small number of times Prime and Maxor know they competed seems telling. According to Maxor, "Prime and Maxor have both bid on only approximately 1% of Maxor's total opportunities in this time frame." Wheeler Decl. ¶ 21; *cf. Saban*, 780 F. Supp. 2d at 708–09 (finding two PBMs "rarely compete[d]" when the "objective evidence" showed they competed for the same client "fewer than ten times" in the past five years, which constituted only 0.5 to 2% of their clients).

Beatty's new job at Maxor, though it overlaps some with her old job at Prime, seems purposefully designed and sufficiently distinct so that disclosure of Prime's trade secrets is unlikely, and certainly not inevitable. *See* Wheeler Decl. ¶¶ 31–54; *see also* Beatty Decl. ¶¶ 46–69. At the hearing on this motion, Prime acknowledged that some of Beatty's responsibilities in her new job are different from her responsibilities at Prime and pose no

concerns. These include Beatty's "listen and learn" duties in phase one.[4] *See* Wheeler Decl. ¶ 44. These also include Beatty's work with Maxor's on-site pharmacies and 340B consulting. *See* Wheeler Decl. ¶¶ 31–32, 47–48.

Though Prime objects to Beatty supervising Maxor's rebate-aggregation business beginning in phase two of her Maxor employment, Prime does not say specifically that Beatty had responsibility for rebate aggregation at Prime. Instead, Prime relies upon Beatty's receipt of a PowerPoint presentation regarding the development of Prime's rebate-aggregation business, seemingly implying that Beatty might be able to use information from that presentation when her phase-two responsibilities begin on November 26. *See* Overman Decl. ¶¶ 16–18, 20, 22; Second Overman Decl. ¶ 18. Beatty's testimony that she received this presentation while on vacation in early August and viewed it then only on her mobile phone—facts that Prime does not, at this preliminary stage, dispute—seriously undermines any suggestion that this information is at risk of disclosure, much less inevitable disclosure. *See* Beatty Decl. ¶¶ 70–74; Mahmood Decl. ¶ 34. Reviewing the documents under these conditions places Beatty in a poor position to recall their particular contents in a way that would enable her to use that information at Maxor.

---

[4] Rule 65 of the Federal Rules of Civil Procedure permits entry of a temporary restraining order "only if . . . specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Because Prime does not object to Beatty's phase-one responsibilities, and because phase one runs through November 25, 2018, Rule 65's immediacy requirement cannot be established. For this reason, the Court will deny Prime's motion for a temporary restraining order.

Prime's concerns regarding phase three of Beatty's Maxor employment are not specific. In this phase, Beatty is to work on "margin analytics and client reporting," and will "provide insight to business leaders" to "drive enhancements." Wheeler Decl. ¶ 49. These responsibilities are not specifically defined by Maxor, but they also do not clearly align with Beatty's duties at Prime, and Prime has not identified particular trade secrets at risk of disclosure in this phase. More to the point, Beatty's reliance on mere general industry knowledge and experience does not imply disclosure of Prime's trade secrets.

In phase four, which is scheduled to begin March 20, 2019, Beatty's responsibilities overlap to some degree with her job at Prime. *See* Wheeler Decl. ¶¶ 52–54. Beatty will assume responsibility for, among other things, managing Maxor staff who handle the retail-pharmacy networks and negotiating rates with retail-pharmacy networks. *See id.* At Prime, Beatty was responsible for, among other things, "managing the company's ongoing relationships with its large network of pharmacies." Beatty Decl. ¶ 14; *see also* Overman Decl. ¶ 15.

Here, Prime seems especially concerned with Beatty's involvement in negotiating rates with retail-pharmacy networks. *See* Second Overman Decl. ¶ 13. Prime and Beatty offer different testimony concerning her pharmacy-negotiation role at Prime. Prime says Beatty was "the primary negotiator with pharmacies." Overman Decl. ¶ 15. Beatty says she "typically was not involved in negotiations" with pharmacies and "was not required to develop or negotiate specific rates." Beatty Decl. ¶ 62. Moreover, Beatty maintains that she does not recall, nor did she ever know by memory, any of the "thousands" of "figures and formulas used by Prime to determine [pharmacy] reimbursement rates at any particular

point in time." Beatty Decl. ¶ 57; *see also id.* ¶ 15 ("Prime maintained hundreds of MAC [Maximum Allowable Cost] lists as of 2018, each of which included thousands of different price points, and all of those prices were systematically reviewed and updated on a weekly basis.").

Mahmood corroborates Beatty's testimony on this point. Mahmood Decl. ¶¶ 15 ("No [one] . . . could possibly remember off-hand the thousands of different price-points that were in effect at any particular time."), 29 ("[I]t would be impossible for me to remember in detail all the specifics of Prime's p ricing, discounts, margin or contractual terms."). At this preliminary stage, and with respect to these issues, the Court accords greater weight to the declarations of Beatty and Mahmood than Overman's. To be clear, the Court finds no fault with Overman's declarations. But Beatty's declaration is based upon her personal experience, and it is more specific. *See* Beatty Decl. ¶ 2. Also, Mahmood was Beatty's supervisor for the bulk of her time at Prime. *See* Mahmood Decl. ¶ 7. Overman served as her supervisor for approximately one month. *See* Second Overman Decl. ¶ 2.

To summarize, then, Beatty's new position is sufficiently dissimilar to the position she held with Prime, and Maxor has taken sufficient preventive measures, largely in the form of phasing in Beatty's employment, to minimize the risk of Beatty using or disclosing Prime's trade secrets.

Finally, Beatty's actions neither arouse suspicion about her intentions nor reveal a motive to misappropriate Prime's trade secrets. As mentioned earlier, there is no evidence of wrongdoing or that Beatty possesses any documents containing Prime's trade secrets.

Though its proposed order would compel the immediate return of such documents, Prime acknowledges that it has no information suggesting that Beatty actually possesses any. By all appearances, Beatty has been forthright during her transition from Prime to Maxor. She was upfront with Maxor about her ongoing obligations to Prime from the start, providing them with a copy of her Agreement with Prime during early meetings. *See* Beatty Decl. ¶ 45. After announcing her intention to leave Prime for Maxor, Beatty volunteered to "throttle back" her involvement during her final weeks. Beatty Decl. ¶ 31. Prime's response—telling Beatty that it trusted her integrity and that throttling back her employment would be unnecessary, Beatty Decl. ¶ 31, and asking her to stay on for thirty days rather than two weeks, Overman Decl. ¶ 25—reflects trust in Beatty's intentions. Though its Agreement with Beatty permitted Prime to inspect any personal electronic devices that Beatty used to conduct Prime business, Prime confirmed at the hearing that it did not make that request. *See* Agreement § 1.B.e. Prime had no reason to distrust Beatty, and at this preliminary stage, neither does the Court.[5]

2

The Court next evaluates Prime's likelihood of success on its breach-of-contract claim against Beatty. In a nutshell, the Court concludes that Prime is not likely to prevail

---

[5] Reflecting the high bar posed by the inevitable-disclosure doctrine, the Court has identified only one case from this District finding inevitable disclosure of trade secrets: *Cenveo Corp. v. Southern Graphic Systems, Inc.*, No. 08-cv-5521 (JRT/AJB), 2009 WL 161210, at *5 (D. Minn. Jan. 22, 2009). That case is distinguishable. The *Cenveo* court determined that the departing employee had retained proprietary documents and that there were "discrepancies in her explanations for doing so" suggesting "her motives were not altruistic." *Id.* No similar allegations or facts appear in this case.

on the merits of this claim because the Agreement at issue permits Beatty to work for a Prime competitor so long as Beatty "has not assumed a position . . . that would lead to the inevitable disclosure of Confidential Information."  Agreement § 3.A.  As the Court determined with respect to Prime's statutory trade-secret claims, Prime has not shown that Beatty's position with Maxor is likely to lead to the inevitable disclosure of confidential information.

Under Minnesota law, a breach-of-contract claim requires: "(1) a valid contract; (2) performance by the plaintiff of any conditions precedent; (3) a material breach of the contract by the defendant; and (4) damages."  *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 989 (D. Minn. 2006).  Though defendants challenge the non-compete's enforceability, the parties focus more of their attention on whether Beatty's new job with Maxor breaches the contract, and that is where the Court will go.

Here, determining whether a breach has occurred starts (and for practical purposes ends) with interpreting the non-compete itself.  The non-compete contains a general prohibition followed by two exceptions to the general prohibition.  The prohibition says that, for twelve months after termination of her employment with Prime, Beatty "shall not, directly or indirectly . . . render the same or substantially the same services to an entity or operation engaged in the same or similar Business as [Prime] anywhere in the United States."  Agreement § 3.A.  If this were all the non-compete said, the Court would have to determine whether Beatty's employment with Maxor amounted to "the same or substantially the same services" that she provided to Prime, and whether Maxor is "an entity or operation engaged in the same or similar Business as [Prime]."  But the Agreement

doesn't end there.  It goes on to say that there are two situations in which "[Beatty] is free to work for or provide services to a competitor," regardless of whether the work would violate the non-compete's general prohibition.  *Id.*  She may work for a competitor provided that:

> (a) such work or services does not include, directly or indirectly, any responsibilities for, or have any connection with, a Competitive Product . . . during the [twelve-month] Restricted Period *or* (b) Employee has not assumed a position with a competitor that would lead to the inevitable disclosure of Confidential Information.

*Id.* (emphasis added).  The word "or" is dispositive.  Because the two carve-outs are disjunctive, Prime's claim fails if Beatty's employment with Maxor fits under either carve-out (a) *or* carve-out (b).  For the reasons discussed in the previous section analyzing Prime's statutory trade-secret claims and the inevitable-disclosure doctrine, Beatty's employment with Maxor does not place her in "a position with a competitor that would lead to the inevitable disclosure of Confidential Information."[6]  Therefore, Prime has not shown that it is likely to succeed on the merits of its breach-of-contract claim.

3

The parties devote less attention to Prime's claim against Maxor for tortious interference with contract.  To succeed on this claim, Prime must show: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional

---

[6]     Prime's use of the disjunctive "or" makes sense in the context of the carve-outs.  In the abstract, it makes sense that Prime would not be terribly concerned about a former employee working for a competitor or on a "Competitive Product" if the disclosure of confidential information were not inevitable.  Also, Prime does not argue that the definition of "Confidential Information" in the Agreement is different from the definition of "trade secrets" in the DTSA and MUTSA.

procurement of its breach; (4) without justification; and (5) damages." *Menzies Aviation*, 978 F. Supp. 2d at 998–99 (quoting *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994)). Because Prime has not shown a likelihood that Beatty breached the Agreement, it cannot show a likelihood that Maxor intentionally procured Beatty to breach the Agreement. Prime does not address the likelihood of success of its claim against both Beatty and Maxor for tortious interference with contractual relations or prospective economic relations. "While the evidence may later demonstrate otherwise," the Court finds that Prime has not at this stage shown a likelihood of success on either of these tortious interference claims. *Bay Side Recycling Co., LLC v. SKB Envtl., Inc.*, No. 14-cv-4550 (SRN/LIB), 2014 WL 6772908, at *16 (D. Minn. Dec. 1, 2014); *see also Hypred S.A.*, 2004 WL 1386149, at *1 ("[T]he party requesting the injunctive relief bears the 'complete burden' of proving all the [*Dataphase*] factors." (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987))).

B

The Court next considers irreparable harm, the second *Dataphase* factor. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The harm must be "*likely* in the absence of an injunction," *Winter*, 555 U.S. at 22, "great[,] and of such imminence that there is a clear and present need for equitable relief," *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). A plaintiff must show more than a future risk of irreparable harm; "[t]here must be a clear showing of immediate irreparable injury." *Berkley Risk Adm'rs*

*Co., LLC v. Accident Fund Holdings, Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (citation omitted) (internal quotation marks omitted). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc.*, 346 F.3d at 844; *see also Gamble v. Minn. State Indus.*, No. 16-cv-2720 (JRT/KMM), 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

Prime argues that "[t]he state and federal trade secret statutes and caselaw explicitly recognize that misappropriation of trade secrets—even the mere threat of it—constitutes irreparable harm and warrants injunctive relief." ECF No. 6 at 25 (citing 18 U.S.C. § 1836(b)(3)(A); Minn. Stat. § 325C.02; *Equus Comput. Sys., Inc. v. N. Comput. Sys., Inc.*, No. 01-cv-657 (DWF/AJB), 2001 WL 1636487, at *4 (D. Minn. May 4, 2001)). But the plain text of these statutes does not provide that the mere threat of misappropriation leads to an inference of irreparable harm or a presumption that injunctive relief should be ordered. *See* 18 U.S.C. § 1836(b)(3)(A)(i); Minn. Stat. § 325C.02(a); *see also Katch*, 143 F. Supp. 3d at 875 ("[T]hreatened misappropriation *may* constitute irreparable harm." (emphasis added)). Just as these statutes permit injunctive relief to remedy misappropriation of trade secrets, they also permit an award of damages. *See* 18 U.S.C. § 1836(b)(3)(B); Minn. Stat. § 325C.03(a).

Prime has not established that it is likely to suffer irreparable harm. The harm Prime identifies flows exclusively from the misappropriation of its trade secrets through inevitable disclosure. But the Court determined already that Prime has not shown a likelihood of inevitable disclosure. Just as that determination leads to the conclusion that

Prime is not likely to prevail on the merits, it warrants the conclusion that Prime has not shown that legally cognizable harm is likely.

Assuming for the sake of argument that harm were likely, the irreparable-versus-reparable issue presents a closer call. The Court nonetheless concludes Prime has not shown that its alleged injuries are truly irreparable. On one level, this question seems straightforward: if its trade secrets were misappropriated by Beatty and Maxor, Prime no doubt would identify lost business resulting from the misappropriation. Those harms are reparable through damages. *Wells Fargo Ins. Servs. USA, Inc. v. King*, No. 15-cv-4378 (PJS/JJK), 2016 WL 299013, at *8 (D. Minn. Jan. 25, 2016) ("[T]his case is about money. No historic building is going to be destroyed. No toxins are going to be released into the environment. No ship is going to leave port, never to return. King stole clients away from WFI, and the main harm that WFI suffered is lost profits on the business of those clients. By definition, lost profits are 'reparable' through money damages."). On another level, it is true that some harms resulting from trade-secret misappropriation may be difficult to quantify. Perhaps there are more nebulous competitive advantages that are difficult to calculate or remedy through a damage award. Regardless, they have not been identified here in a way that justifies a finding that Prime is likely to suffer immediate irreparable harm.

## C

The balance-of-harms factor involves "assess[ing] the harm the movant would suffer absent an injunction," as well as the harm the other parties "would experience if the injunction issued." *Katch*, 143 F. Supp. 3d at 875. This factor does not weigh clearly in

favor of any party. The Court previously determined that Prime does not stand to suffer irreparable harm in the absence of an injunction. Maxor and Beatty describe the effect an injunction would have on Beatty as "devastating." ECF No. 30 at 21; *see* ECF No. 32 at 44–45. However, at the hearing on this motion, defendants stayed silent when Prime suggested (more than once) that an injunction would not cause Beatty to lose her job. This makes sense. Prime concedes that some of Beatty's duties at Maxor do not trigger a violation of her Agreement with Prime. It seems reasonable to infer from defendants' silence that, if an injunction were issued, Maxor would retain Beatty at least to perform those duties to which Prime does not object. *See St. Jude Med. S.C., Inc. v. Saxon*, No. 13-cv-2332 (JRT/JJK), 2013 WL 6481440, at *8 (D. Minn. Dec. 10, 2013) ("Even with a preliminary injunction in place, [new employer] can continue to benefit from [employee's] work that falls outside the scope of his covenant not to compete."). Accordingly, this factor is neutral.

### D

The Court also finds that the final *Dataphase* factor, the public interest, is neutral. *See Menzies Aviation*, 978 F. Supp. 2d at 1001 ("While the public interest does favor protecting confidential information and enforcing contracts, it also favors competition."). This case implicates primarily business interests, not public rights. *See Nilfisk, Inc. v. Liss*, 17-cv-1902 (WMW/FLN), 2017 WL 7370059, at *7 (D. Minn. June 15, 2017). Realistically, Beatty's presence or absence at Maxor is not going to "seriously deteriorate [or improve] the quality of health care," nor would it "seriously affect the competition in the industry." *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1095 (D. Minn. 1981).

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1.  Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [ECF No. 4] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  November 1, 2018                    s/ Eric C. Tostrud
                                            Eric C. Tostrud
                                            United States District Court